May it please the Court, I'm Terry Anastasio Ropers Majeski Cohen and Bentley, appearing on behalf of the appellant Gabriel Carteris. Let me ask you this. How did the distributor here contribute to Carteris' injury? I mean, they didn't direct the scene that she was injured. They didn't require the actor who injured her to play that role. So I don't see how the distribution defendants are involved in this at all. And so I don't really think they're legitimate defendants. And their citizenship is not taken into account. We do have diversity. Carteris is a California citizen. The remaining defendants are Canadian. So there is diversity in jurisdiction. And the district court had then the jurisdiction to dismiss the case for form of nonconvenience. And so why shouldn't this matter here be affirmed and sent back to the district court for entry of a judgment dismissal in favor of the distribution defendants? And that's the way I see this going. Your Honor, that certainly goes right to the heart of the matter. May it please the court, I'd like to reserve two minutes for rebuttal. There is no dispute here that Joe Broido and his company Porchlight are California companies. There is no dispute that they involved themselves in the production of this film through a distribution agreement that gave Mr. Broido the ability, the entitlement to be involved with the production on a day-to-day basis. But counsel, under Hooker and Bikini cases, isn't that fatal to your claim? Those are California cases. They make it clear that there is no duty in this circumstance to do anything. And there's no evidence that I'm aware of that they did anything that dealt directly with your client's injury. That said, you know, I don't want you to take precautions or I want you to do it this way, that way. There's no evidence like that, is there? Well, first of all, Your Honor, I don't believe that the district court applied the right standard in applying those cases. It is not our duty to show that Mr. Broido and Porchlight will necessarily be held liable. We have allegations pursuant to which they can be held liable. But as I understand it, counsel, the role of the district judge here was to take the complaint as pled and assuming that all of those allegations are true, then you apply California law. Right. He applied Hooker and Bikini, as I understand it. Right. And when he did that, he concluded, in effect, it was a 12 v. 6 ruling. True. He said you can't possibly have any relief under this. Right. Isn't that the very basis for an, in quotes, sham defendant in this setting? Well, that may be the basis for it, but it's not reconcilable with California law. And Hooker and Bikini are. Pardon me? That's what Hooker and Bikini are. Those are California cases. And I'm saying that the district court's decision is not reconcilable with the district court's ruling, is not reconcilable with those decisions. What we have here is, I've already mentioned, we have a contract that gave him the right to be involved in a day-to-day basis. We know that, for a fact, he was involved on a day-to-day basis because there is a declaration from Ms. Carteris in the record before the court that says that she spoke to the director of the film, and on numerous occasions, the director said, I'm on the phone with Joe. Okay. So we know he was involved on a day-to-day basis. Is there any evidence that was pled that suggests that he directed his friends in Canada how to deal with your client that created the problem? The way the set was set up or the way she was protected in terms of stunts or so on. Right. There's no evidence of that, is there? No, but, Your Honor, that's not the problem. That's the point. You just said that, essentially, the district court conducted a 12B6 hearing. Well, a 12B6 hearing is directed at the pleading, and the complaint in this action sufficiently pleads the existence of a duty owed by Mr. Broido and Porchlight to Ms. Carteris that was breached under the circumstances giving rise to her injuries. So if it's a pleadings issue, there's no question that the sham defendant… With respect, counsel, maybe I'm misreading these cases, but I thought that when you took it as pled and you apply the law that I've cited, that the court could find, as if it were a 12B6 motion, that under those facts as pled, that there was no way that a cause of action could be stated. Because there was, under California law, where you deal with an independent contractor and a distributorship situation, there is no duty of the type that you speak of. This is not, again, if this were a pleading case, purely a pleading case, the error is clear specifically because we have pleaded facts giving rise to that duty, you don't get to the independent contractor issue unless you look at evidence. And with respect to the district court, the evidence of how Mr. Broido and Porchlight became involved here, this isn't a purely independent contractor relationship. Mr. Broido and Porchlight Entertainment had the contractual right to be involved on a day-to-day basis, and we know that, in fact, they were. Now, the question becomes, what evidence is there, as the court, the question the court posed, what evidence is there that Mr. Broido or Porchlight are responsible for Ms. Carteris's injuries? Now, that is certainly the way the district court looked at it, judging from the brief argument on that motion. However, Mr. Broido and Porchlight can be liable in part for those injuries without having said, hire an enormous actor and drag this small actress by her neck up a staircase. It doesn't have to be that. And you have to remember that discovery in this case, we don't know the extent to which, whether and how much Mr. Broido was, in fact, involved in decisions of day-to-day filming. We do know that Ms. Carteris approached the director with a suggested change to the script, and the director said, I can't without getting clearance from Joe. So we know that, in fact, he was involved in these decisions. Was he involved in a decision that led to this injury? We don't know that. That's for a prior fact. That's for discovery. It's not for a 12D6 motion. It's certainly not for a motion to remand where the fact that the supposedly fraudulent defendants are contractually entitled to be involved is before the district court. I just want to touch very briefly. There's something I want to make sure I mention. It's in the record before the court also that one of these purportedly Canadian parties, the parties involved now in the suit up north, filed discovery responses three days after the motion to remand was denied, in which they admitted that one of the defendants, the court is aware of how these discovery responses say, say, if you are a corporation, and you is defined as the specific defendant, if you are a corporation, say, where you were formed, what your residence is, they identified themselves as a corporation formed in California, and there's nothing in those discovery responses that says that that company stopped being a California corporation, and, in fact, there's quite a dispute. It would be something very difficult to untwist short of discovery and a Rule 54 motion down the road. That's why I'm saying what the district court did here, and I believe that the court has focused on what the ‑‑ absolutely focused on what the district court did. The district court purported to do a 12B6 motion, but considered evidence. Considered evidence, oh, well, it's a distribution agreement, and the distribution agreement, oh, we're going to distribute. We're involved with the film? No, no, no, no. The distribution agreement was executed before filming started, and Mr. Broido had a contractual entitlement to be involved. That he, in fact, took advantage of. We know those things. I want to address very briefly. Mr. Broido's counsel has raised a hearsay objection to Ms. Carteris' statements about the director's statements, and, of course, those statements are not admissible hearsay because they're subject to a present sense impression exception. I just want to put that on the record. Now, in addition to the fact that there was no diversity here, the order transferring for foreign nonconvenience was erroneous also because the district court failed to apply the proper standard that one has to apply when a plaintiff, like Ms. Carteris, chooses her own forum. What we have here is we have a professional, an entertainment professional with a couple of decades in the business who has developed her reputation and her marketability, and we have somebody making a film in Canada who contracts with her and says come up here because the people making the film in Canada know that a name like that is, in fact, marketable. And the district court, when it ruled on this foreign nonconvenience motion, all it did was say, well, the precipient witnesses of the event are in Canada. Counsel, I thought that you had dismissed the forum non – your forum nonobjections. Pardon me? Aren't you – aren't you now moot? Aren't you now proceeding in Canada? No. And this is why, Your Honor, the forum nonconvenience ruling necessarily includes the ruling that Mr. Broyden and Porchlight are sham defendants because it cannot stand that they are not. If they are not sham defendants, then the district court didn't have jurisdiction to rule on the forum nonconvenience motion. And – Wait, wait, I missed something there. Well, the problem is that as long as the order on forum nonconvenience stands, then Mr. Broyden and Porchlight could argue that there is a final statement of a California – a federal California court to the effect that they are – they cannot possibly be recovered against. So this is far from moot. It's essential that the court correct that error. I understand. I wasn't asking about mootness. But your Canadian defendants are no longer part of your lawsuit in California. Isn't that correct? That is correct. But Mr. Broyden and Porchlight were dismissed as well for forum nonconvenience. It's in the docket. I'm not trying to explain it, Your Honor. I'm telling you the fact. The fact is that after making a note on the record that he was only ruling on the motion brought by Mr. Kahn, the names in this case, Mr. Kahn, Central Myth, and First Street, after specifically saying that on the record, if you look at the court's docket, you will see that the case is final. There's a final judgment in the case now. And that cannot be allowed to stand specifically because of the implicit finding. It's not even implicit in the order denying remand. It's expressed that Mr. Broyden and Porchlight, who had these rights and exercised these rights, on the evidence before the district court that they were sham defendants. Can Ms. Carteris potentially recover from Joe Broyden and Porchlight? Absolutely. Absolutely. If evidence is developed in discovery that there were questions about the casting of this person, let's not forget that in the record before you is the fact that when Ms. Carteris had to be replaced in this role and another actress was brought in, the shooting schedule was changed so that this scene where Ms. Carteris had been injured was moved to the back. It was the last scene shot in case we cripple up another actress. Okay, Your Honor, is it possible that Joe Broyden and Porchlight could be liable? Absolutely. Does it sound like I could plead facts to a jury that would persuade them to find it partially liable? Absolutely. And are there duties that they owe Ms. Carteris above and beyond this distribution agreement? Absolutely, because he did in fact, and we know that more to the point the district court knew it, in fact involve himself frequently in the day-to-day filming. Used up the whole time. Unless the court has any questions. Thank you, Your Honor. Thank you. Good morning, Your Honors. Thank you. And may it please the Court, Judith Tishkoff for Apollese, Porchlight, and Joe Broyden. I think that Your Honors hit the nail on the head in this. There is no duty, there was no duty on the part of Porchlight Entertainment, either created by the distribution agreement or otherwise owed to Ms. Isaacs in this case. I think that. I have a procedural question here. It appears that the district court closed the case prior to entering a judgment of dismissal against this quote sham defendants in quotes. Is that the proper procedure here? Your Honor, it seems like this is maybe something that's fallen between the cracks here. We maybe need to clarify this. Let's assume arguendo that these were sham defendants. Does the fact that the district court dismisses them from the action as sham defendants constitute a final judgment or does there have to be a separate 12B6 motion which would make a final resolution or some other type of disposition? I think that, Your Honor, it would be that the court could affirm the dismissal. I think there was a dismissal of them. But I guess my question is when the court ruled that these were sham defendants, does that in and of itself constitute a final judgment as to these people, or do you need a separate motion to dismiss them from the case? I think generally, Your Honor, in the past the way that I've seen it is that they deem them sham or fraudulent defendants, then a motion is made. So there's a separate motion made. From the case. In this case, it appeared to me that the court kind of did it on its own and entered the dismissal on its own without us having to go ahead and file the ---- What date? What date did that occur? The date of the ---- The dismissal. I believe that was ---- When it was filed. I believe it was on June 2nd. June 2nd. 2008. That was the date of the hearing of the motion for dismissal.  June 2nd. 2008. The motion for remand was heard and denied on February 19th, 2008. The fact that your opposing counsel suggested that the record showed that the two, in quotes, sham defendants, in quotes, were still in the case at the time the forum nonconvenience argument was made, that tends to confirm what you were talking about, that the normal practice would have been for there to be a motion, 12B-6, I suppose, to have them removed from the case, independent of the sham defendant ruling. Is that correct? That's what I'd seen in the past, Your Honor. But when they filed the notice of appeal and we got the docket and the dismissal, I had, hopefully not erroneously, assumed that the court had gone ahead and entered the dismissal for the sham defendants in this case. I think that the 12B-6, that it was a standard of a 12B-6 motion, but pursuant to case law we are entitled to submit additional declarations and evidence to support the finding of a sham or fraudulent defendant. And that was done in this case, and that evidence was considered. It's not just based on the pleadings, but the ruling of this Court was correct in that it was based on analysis of the distribution agreement as well as the other evidence which was submitted. The distribution agreement does not give any day-to-day control over the production of this picture to either Mr. Broido or to Porchlight Entertainment. The signatories to this agreement was Porchlight Distribution, and Joe Broido was not even a signatory to it, nor was the plaintiff, as a matter of fact. Posing counsel made reference to the agreement and certain communications, what was before the district court when the district court ruled on the sham defendant issue? Was it a motion accompanied by points of authorities and it was attached to that, or was the contract attached to the original complaint? No, the contract was not attached to the original complaint. The court had before it on the motion for remand, in opposition to the motion for remand, and then the replies. The court had the entire distribution agreement. I believe there was a couple things redacted from it with respect to costs and also had the declaration of the plaintiff. There were several declarations, actually, of the plaintiff that the court had before it. So that's where that other evidence came from. Was the court entitled under our rules to consider the contents of the distribution agreement in making the sham defendant decision? Yes, Your Honor. Okay. Pursuant to the case law, the court is entitled to it. I believe it's Crusoe, which is at 872 F2D 1416, a 1989 case. The court can consider declarations and other evidence in addition to the pleadings. And nowhere, as I started to say, nowhere in the distribution agreement is any day-to-day control given in this case. The declaration, the other document the plaintiff relies on, which wasn't mentioned by counsel here, is some travel documents that were cc'd to Mr. Boido, and that doesn't show any kind of control over this particular scene. The plaintiff is very specific with respect to how this incident occurred. And when you read that, and it's at the excerpts of record, I believe, page 759, she goes into great detail about exactly how it occurred and how many takes it took and how she was dragged and things like that. That's not something that the distributors have any control over whatsoever. And you can see that in this particular declaration. You can see that this is not something that distributors have anything to do with. The final piece of evidence that the plaintiff relies on is her own declaration about some conversations that she says she overheard, I guess only half of them, between the director of the picture and purportedly Mr. Boido. I objected to those on the grounds that they're hearsay. I don't know that she can say that it was Mr. Boido. She didn't hear that part of the conversation. She doesn't know what was discussed, whether they were discussing particular filming of a particular scene or I want this filmed in this particular way. I mean, the argument is made that Mr. Boido and Porchlight was given some creative control, but that's nothing that's completely separate from day-to-day control over the picture. If the Court has any questions, I'd be happy to answer them. Otherwise, I'll submit. Thank you. Thank you. Can I speak very briefly in the docket? Very briefly. Very briefly. The notation in the docket to the effect that this case was dismissed altogether is at U.R. 847. The Court inquired about the timing of the dismissal and whether that meant that Joe Boido and Porchlight were no longer in the action by the time the motion for foreign nonconvenience came up. Joe Boido and Porchlight answered this case on February 25th, six days after the order denying remand from the bench in this action. So, in fact, they appeared after the Court had already made the statement that they were somehow sham defendants. That's also at U.R. 857. The last thing I want to say is that, unlike some of the other cases that were before you today, this case does not present novel law.  And I want to say that the Court has not presented a single case where the court's independent judgment is applied and where diversity jurisdiction is the only removal jurisdiction urged, that this Court's independent judgment is applied and that all intendments, all reasonable intendments, are given to the evidence declarations by Mr. Boido, declaration by Ms. Carteris. The district court should not have done that. You don't weigh that evidence any more than you weigh the evidence in a Rule 54 motion. I urge the Court – I'm not going to urge the Court at all. I thank the Court for its attention. Thank you.
judges: Pregerson, Bybee, Smith M.